FILED
2012 Sep-30  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **ELIZABETH W. McELROY, as Administratrix of the Estate of Reginald W. Osby,** ) ) ) ) | |
| **Plaintiff,** ) ) | |
| **v.** ) ) | **CASE NO. 2:09-CV-0246-SLB** |
| **CITY OF BIRMINGHAM, ALABAMA; MATTHEW HUTCHINS, in his Official Capacity as an Agent for the City of Birmingham and in his individual capacity,** ) ) ) ) ) ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendants' Motion for Summary Judgment. (Doc. 30.)[1] Plaintiff Elizabeth W. McElroy, as Administratrix of the Estate of Reginald W. Osby, has sued the City of Birmingham and its police officer, Matthew Hutchins, alleging violations of Mr. Osby's Fourth Amendment rights and Fourteenth Amendment/Equal Protection rights. She also alleges a state-law wrongful death claim. These claims are based on the shooting death of Mr. Osby on October 12, 2008. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 31), is due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes.   Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word-genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id.*  The substance of Rule 56 is unchanged; therefore, cases citing prior versions of Rule 56 remain applicable to the current rule.

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655(1962) (per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

3

## III.  STATEMENT OF FACTS[3]

Exhibit A to the Scheduling Order states, "All statements of fact must be supported by specific reference to evidentiary submissions." (Doc. 10, Ex. A at 3.) Also –

> Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based. All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.

(*Id*. at 6 [original emphasis deleted].) "The court reserves the right sua sponte to strike any statements of fact or responsive statements that fail to comply with these requirements." (*Id*. [original emphasis deleted].)

A number of defendants' responses to plaintiff's undisputed facts do not comply with the court's Exhibit A; therefore, these facts are deemed admitted for purposes of summary judgment.

### A.  BACKGROUND

Defendant Matthew Hutchins is a Police Officer with the City of Birmingham Police Department. He graduated from the Birmingham Police Academy in 2003. (Doc. 31, Ex. 1 at 9-12; *id*., Ex. 7 at 18.) After a month of training, Officer Hutchins was assigned to the Patrol Division in the West Precinct. (*Id*., Ex. 1 at 11.)

---

[3]The "facts" as stated herein and throughout this opinion may not be the actual facts. As required for purposes of deciding the Motion for Summary Judgment, the facts and all reasonable inferences therefrom are drawn in favor of the non-movant.

Officer Hutchins received training at the Police Academy on dealing with a person with a mental illness and on the City's Use-of-Force Policy.  (Ex. 1 at 16, 156-57, 160-62, 224.)  The City's Use-of-Force Policy establishes and regulates the amount of force a Birmingham police officer is allowed to use in various situations.  (*See* doc. 31, Exs. 3 and 4.)  The policy defines "lethal force" as "Physical force which is readily capable of causing death or serious bodily injury," and "any force which the officer believes could result in serious injury or death."  (*Id*., Ex. 3 at §§ IB and IIF.)  An officer's justification for the use of lethal force "must be limited to what reasonably appears to be the facts known or perceived by the officer at the time he decides to use such force."  (*Id*. § VIIC.)   A suspect using a deadly weapon is a Level VI incident and allows the use of firearms by the police officer.  (*Id*., Ex. 3, §§ IIIF and IVF.)

Officer Hutchins was trained how and when to use a taser versus a firearm when dealing with someone with a deadly weapon.  (*Id*., Ex. 1 at 29, 32-35; *id*., Ex. 2.)  The taser is a Level IV Force weapon.  (*Id*., Ex. 2 § IIA.)  Because tasers do not always work properly, Officer Hutchins was trained to use a firearm, not a taser, against persons who are armed with a deadly weapon and are threatening deadly force against the officer or another person.  (*Id*., Ex. 1 at 33-34.)  The policy states a taser is "an additional tool" and so it does not replace firearms; it is used to control dangerous or violent people when deadly force does not appear to be justified and/or necessary, or when there is a reasonable expectation that it is unsafe for officers to approach within contact range of the subject.  (*Id*., Ex. 2, § IIG.)

5

Hutchins testified that he is a Native American of the Echota Cherokee Tribe, but he stated he was white on forms completed in his capacity as a police officer.  (Doc. 31, Ex. 1 at 27, 37; *id.*, Ex. 13; doc. 34, Exs. 3-7 and 58.)

## B.  PRIOR CALLS TO CITY'S POLICE DEPARTMENT BY CHRISTINE LEATH

The following facts are deemed undisputed:[4]

1.  On June 19, [2008], Christine Leath[, the wife of decedent Reginald Osby,] called the police about her 27-year-old schizophrenic son, Deron Cook, not taking his medication and behaving violently.  The dispatcher coded that call as a "signal 78" (for mentally disturbed persons) and sent the police to her residence.  [(Doc. 34, Ex. 1 ¶¶ 2-3; *id.*, Ex. 17; doc. 31, Ex. 10 at 69-71.)]

2.  Subsequently, Deron went to Brookwood Hospital for three weeks for treatment for mental illness, and Christine moved to 1917 Avenue J in Ensley.  [Doc. 34, Ex. 1 ¶ 4; *id.*, Ex. 18.)]

3.  After Deron's hospital discharge, Christine called the police again on August 5, 2008 about Deron's erratic behavior relating to his mental illness, and the police again responded to this signal 78 call.  [(*Id.*, Ex. 1 ¶ 5; *id.*, Ex. 19.)]

4.  Next, on September 26, 2008 Christine called the police yet again about Deron being off his medication and behaving very aggressively due to his mental illness, and the police again responded to this signal 78 call.  [(*Id.*, Ex. 1 ¶ 6; *id.*, Ex. 14.)]

(Doc. 35 at 6.)  The responding officer on these calls did not "flag" this residence in police records to alert other officers to reoccurring problems with someone who is mentally ill at this address.  (Doc. 31, Ex. 7 at 16-17; doc. 34, Ex. 50 at 31.)

---

[4]See, *supra*, pp. 3-4.

## C.   EVENTS OF OCTOBER 12, 2008

The following faces are deemed undisputed:[5]

45.   On Sunday October 12, 2008, Christine was cooking dinner at her 1917 Ave. J. home in Ensley AL while her husband, 59 year old Reginald Osby, ("Osby") the decedent in this case, was in the bedroom.  [(Doc. 34, Ex. 1 ¶ 9.)]

46.   Deron burst into the house in a rage.  Although Christine had been feeding Deron and at times allowing him to sleep at her home, Christine had told Deron to leave because he had not been taking his mental illness medication.  [(*Id*. ¶¶ 8, 10.)]

47.   When Christine told Deron to leave, Deron became aggressive towards Christine, cursing and slapping her; therefore, Christine called the police, yet again, on Deron.  [(*Id*. ¶¶ 10-12.)]

48.   Osby came out of the back room and Deron behaved aggressively towards him.  Christine's 13 year old son, Reginald Cook, came into the house and told Deron to leave his parents alone.  Deron reacted by chasing Reginald, grabbing him and stabbing him with a knife in the hand.  [(*Id*. ¶¶ 14-17.)]

49.   Osby stepped in to protect his son from Deron, and Deron started trying to attack Osby, but others arrived to help, including Diontez Cook (age 14) and Jarvis Harris (age 17), and they managed to wrestle the knife from Deron.  [(*Id*. ¶¶ 20-22, 32.)]

50.   Christine called the police again to find out where they were, because the station is only a block and a half from her house.  [(*Id*. ¶ 18.)]

51.   In one of her calls to the police, Christine mentioned that Deron was mentally ill, as she had done in her previous call to the police on the previous occasions.  However, the recordings of her calls are unclear, sound altered, and omit her reference to Deron's mental illness.  [(*Id*. ¶ 19.)]

---

[5]See, *supra*, pp. 3-4.

52. Meanwhile, Deron, had grabbed a fork and used it to stab Osby; the autopsy report confirms Osby was stabbed with the fork.  [(*Id*.; *id*., Ex. 2; *id*., Ex. 27 at 2.)]

53.  Although Christine's house (1917 Avenue J) falls outside their regular beat, [(doc. 31, Ex. 11 at 53)], the dispatcher sent Hutchins and Mays to Christine's house at approximately 3:34 p.m.  On this occasion, dispatch coded the call as a signal 38, a domestic call.  Officers Ryan and Barron, Unit 437, were also sent, but Hutchins and Mays arrived first.  [(*Id*., Ex. 1 at 13-14; *id*., Ex. 7 at 11; doc. 34, Ex. 13; *id*., Ex. 29.)]

54.  Violent signal 38 calls require supervisory notification.[footnote] [(Doc. 34, Ex. 13; *id*., Ex. 30 at 2.)]

[Footnote] Defendants' expert, Cooley, testified he was an expert on Defendants' policies surrounding domestic disturbance calls and that the dispatchers were not supposed to notify a supervisor about a domestic disturbance call that involves potential violence; however, upon being shown this policy requiring the supervisor to be notified, Cooley changed his testimony and admitted that dispatch should have notified the supervisor on the October 12, 2008 call at issue, but the records indicates dispatch did not notify a supervisor until after the shooting when the Officer, after the shooting, put in an emergency call for supervision and all units.  [(Doc. 31, Ex. 10 at 52-53; doc. 34, Ex. 30 at 2.)]

55.  When Officers Hutchins and Mays pulled up to the house they noticed a kid with a butcher knife standing in the doorway.  [(Doc. 31, Ex. 1 at 97-99; *id*., Ex. 7 at 29.)]

56.  As the Officers approached, the kid put down the knife inside the house, and, according to Hutchins, the boy walked out onto the porch and opened the door for the officers.  [(Doc. 31, Ex. 1 at 99-100.)]  Mays stated the boy stayed inside and moved to the side as he and Hutchins entered the house.  [(*Id*. at 29-31.)]

(Doc. 35 at 15-17.)

Officer Hutchins had no knowledge of any earlier problems at this residence involving Deron Cook or that Deron Cook suffered from a mental illness. (Doc. 31, Ex. 1 at 86, 172, 225.)

When Officers Hutchins and Mays arrived at the house, they heard yelling coming from inside the house. (*Id*., Ex. 1 at 99-100; *id*., Ex. 7 at 29-30, 86, 100.) Although Officer Mays testified that he announced, "Birmingham Police, upon entering the home, Ms. Leath testified that the officers did not announce their presence. (Doc. 34, Ex. 1 ¶ 23.) For purposes of summary judgment, the court assumes that Officer Mays did not announce, "Birmingham Police." Defendants also contend that their presence was obvious because they were in uniform and their badges were displayed. However, the evidence indicates that Mr. Osby had his back to the officers. (Doc. 31, Ex. 1 at 116; *id*. Ex. 7 at 31, 67-68.)

Ms. Leath testified that she told the officers her son, Deron, was responsible for the altercation and that Deron was "retarded." (Doc. 34, Ex. 1 ¶ 24; *id*., Ex. 10; doc. 31, Ex. 1 at 18, 87-88, 101-07, 179-80, 217; *id*., Ex. 7 at 31-32, 34-35, 39-43, 51, 68, 86.) Officer Hutchins contends that he did not know which man was Deron Cook. (Doc. 31, Ex. 1 at 90.) He testified that Deron Cook, who was 27 years old, looked older than Mr. Osby, who was 59. (Doc. 31, Ex. 1 at 117, 130-32, 218-19; doc. 34, Ex. 8 at 4.) Defendants' expert, George Cooley, testified that anyone could tell that Mr. Osby was older than Deron Cook. (Doc. 31, Ex. 10; doc. 34, Ex. 9.)

The following facts are deemed undisputed:[6]

61.  Mays did not follow Hutchins into the kitchen because he had grabbed Christine's arm to hold her back; in doing so, Mays stood behind the wall separating the den from the kitchen, which blocked his view into the kitchen, but Christine stood in the doorway and could see into the kitchen. (Doc. 31, Ex. 1 at 116; *id*., Ex. 7 at 35-37, 41-42, 76, 85, 90-91; doc. 34, Ex. 10; *id*., Ex. 31; *id*., Ex. 32 at 5-6.)]

62.  In his initial statement, Officer Mays noted the children were also present, stating: "I'm getting extremely panic from the children and – right there with the mother."  [(Doc. 31, Ex. 7 at 88; doc. 34, Ex. 32 at 5.)]

(Doc. 35 at 18.)

According to plaintiff, Deron Cook left the kitchen when the officers approached. (Doc. 34-1 at 5; doc. 34-2 at 3).[7]  Officer Hutchins testified that he saw Osby with a weapon, which he thought was a knife, and ordered him to drop it.  Ms. Leath and Reginald Cook both testified that Officer Hutchins did not give Osby any commands.  (Doc. 34, Ex. 1 ¶ 27; *id*., Ex. 2 ¶ 15.)  Officer Mays testified that he heard Officer Hutchins say something to Osby, but he could not hear what was said because Ms. Leath was screaming.  Mr. Osby was beginning to stand and put down the fork when Officer Hutchins shot him in the back.  (Doc.

---

[6]See, *supra*, pp. 3-4.

[7]Reginald Cook's Declaration states in part:

"Deron took off out and ran into the bathroom at [sic] that was attached to the back side of the kitchen.  My father was alone in the kitchen when Police Officer shot him in the back.  My father was not fighting with Deron or anybody when the Police Officer shot him."

(Doc. 34-2 at 3.)

34, Ex. 1 ¶ 28; *id*., Ex. 2 ¶¶ 13-14.)  Officer Hutchins testified that he saw Mr. Osby look at him  before he fired, but Mr. Osby did not drop his weapon, a fork.  (Doc. 31, Ex. 1 at 218.) Officer Mays testified that Officer Hutchins fired less than one second after he heard Officer Hutchins say something to Mr. Osby. [(EXs. 1, 2.)(Ex. 1 at 106-07, 124, 139-40, 144.) doc. 31, Ex. 7 at 38-39, 85.]

The City awarded Officer Hutchins a Combat Cross Award for shooting Mr. Osby. (Doc. 34, Exs. 1-2, 26 at 5; doc. 31, Ex. 1 at 79-82; *id*., Ex. 9 at 85, 93-94.)

## D.   HUTCHINS'S ALLEGED HISTORY OF RACIAL PROFILING AND USING FORCE AGAINST BLACKS

The following facts are deemed undisputed:[8]

77.  Hutchins has been the subject of a racial profiling complaint due to a stop he did of a black man driving a nice car.  The man, Willie J. Murphy, submitted a statement indicating that "Officer Hutchins and his partner (have) serious issues with the African American race (and they) . . . hate and despise black people." [(Doc. 34, Ex. 16.)]

78.  However, [the City's] combined report of complaints on Officer Hutchins ignores the true nature of this racial profiling complaint and summarizes the complaint only as:  "Alleges [officer] was rude towards him".[footnote] [(Doc. 34, Ex. 16.)]

[Footnote]   The man filed a lawsuit, not mentioning race discrimination, his attorney took no depositions and the case was dismissed on Summary Judgment. [(Doc. 34, Ex. 38; doc. 31, Ex. 1 at 19-22, 47-48.)]

---

[8]See, *supra*, pp. 3-4.

79.   Hutchins now says he is Native American because each of his parents were partial Native American;[footnote omitted] however, on the Use of Force reports he signed, Hutchins indicates his race is white.  According to Sgt. Powrzanas, Officers fill out those forms.  [(Doc. 31, Ex. 1 at 27, 37; doc. 34, Exs. 3-7; *id*., Ex. 28; *id*., Ex. 50 at 5-8.)]

. . .

81.   Hutchins has a history of using force against African-Americans: in February 2004 he tased a black male; in May 2005 he tased a black male; in October 2006 he kneed a black male; in June 2007 he tased a black male; in April 2007 he tased a black male; and in April 2009 he tased a black male. [(Doc. 31, Ex. 1 at 35-37, 67-68, 73-74; *id*., Ex. 3; *id*., Ex. 7; *id*., Exs. 23-25; *id*., Ex. 28.)

82.   Hutchins could not identify or point to any record indicating he had used force against a white male, but he volunteered in his deposition that he had shot a white person's dog.  [(Doc. 31, Ex. 1 at 66-67, 71-72.)]

(Doc. 35 at 20-21.)

E.   **CUSTOM AND/OR POLICY OF IGNORING BIRMINGHAM POLICE DEPARTMENT POLICIES TO DOCUMENT, TO INFORM, AND TO PREPARE OFFICERS WHEN DEALING WITH MENTALLY DISTURBED PERSONS**

The following facts are deemed admitted:[9]

5.   The City's policy for "Responding to Persons with Mental Illness," dated December 19, 2006, requires officers to "complete an incident report after answering calls involving a mentally ill person".  [(Doc. 31, Ex. 9, Vol. II at 16; doc. 34, Ex. 20 at 7.)]

6.   When a Community Service Officer (CSO) is not called to the scene, the Policy requires Officers to leave a copy of the incident report with the CSO.  [(Doc. 31, Ex. 9, Vol. II at 16; doc. 34, Ex. 20 at 7.)]  The incident

---

[9]See, *supra*, pp. 3-4.

report must first go to the supervisor for approval and coding, and then it goes to the CSO.  [(Doc. 31, Ex. 1 at 199-200.)]

7.  The written incident report is required regardless of whether the mentally ill person resides at the residence where the officers are called. [(Doc. 31, Ex. 14 at 50-51.)]

8.  Lt. [Carolyn] Lavender, the Officer in charge of communications, confirmed that when an Officer responds to a call concerning a mentally disturbed person, the Officer must complete a written report and "always notify their Supervisor on a 78."  [(Doc. 31, Ex. 11 at 38.)]

9.  The City's policy requires a Patrol Supervisor to be sent to the signal 78 scene by dispatch or called to the scene by the Officer, if, upon arriving on the scene, he or she realizes the person is mentally ill.  When the supervisor arrives he has several steps to complete.  [(Doc. 34, Ex. 20 at 3; doc. 31, Ex. 9 at 37, Vol. II at 84-87.)]

## 1.    Requirement to Complete Written Incident Report and Notify Supervisor Not Followed

10.  It is the custom and de facto policy of the City to not prepare or file incident reports on signal 78 calls or notify the supervisor.  Indeed, in 2008, Defendants had 790 Signal 78 calls (excluding K and L),[footnote] but incident reports were not done **82% of the time**, and Supervisors were not notified **97% of the time**.[footnote]  [(Doc. 34, Ex. 53.)]

[Footnote:]  Calls ending in disposition (K) or (L) involve an Officer assisting, so that Officer does not do a report; that is one reason that not all the 3,433 signal 78's have incident reports.  [(*Id*., Ex. 29; *id*., Ex. 49; *id*., Ex. 53.)]

Footnote:  Whenever Officers respond to signal 78 calls that turn out to be something else, the dispatch log indicates the code change; therefore, a comparison between the signal 78 dispatch reports and the mentally disturbed person incident reports, a determination can be reached indicating what percent of the signal 78 calls are actually recorded onto incident reports, as Defendants' policy directs its Officers to do.  [(Doc. 31, Ex. 9, Vol. II at 23-24.)]

13

11.   Chief Roper and Lt. Lavender admitted that the policy requiring incident reports and supervisor notification is not always followed.  [(Doc. 31, Ex. 9 at 67-68, 77; *id*., Ex. 11 at 43.)]

11.[sic]   In the instant case, the supervisor over the beat where the shooting occurred, Sgt. Powrzanas, was not notified about Christine's September 26th call regarding Deron (he was not the supervisor for the August 5th call), and he admitted the Officers on those calls should have called their supervisors, filled out incident reports, and sent those reports to the CSO. However, no incident report was done for either prior signal 78 call regarding Deron.   [(Doc. 34, Ex. 50 at 28-29, 35-36; 45-47, 57; *id*., Ex. 14; *id*., Ex. 52 at 21; doc. 31, Ex. 9 at 70.)]

## 2.   Failure to Notify Officers about Prior 78 Calls to Residence Resulted in Officers Being Not Prepared on October 12, 2008

12.   Although dispatchers have the capability to search prior calls from a residence to see its history, it is the policy and practice of the City not to train them how to do so.  This is the practice for "no particular reason. It just takes too much time" – a couple of minutes.  [(Doc. 31, Ex. 11 at 17-18, 23-25, 108-09; *id*., Ex. 10 at 57-58.)]

13.   In this case, Officers Matthew Hutchins and Marvin Mays were dispatched to a location off their regular beat, and the City has no policy or procedure for updating Officers new to an area about the history of a residence where they are sent.  If the Officers wanted that information, it is available.  [(Doc. 31, Ex. 11 at 27-28.)]

14.   In order for Officers to alert each other to a residence with reoccurring problems with someone who is mentally ill, the officer or his supervisor should complete out an alert form so that dispatch can "flag" the residence.  [(Doc. 31, Ex. 7 at 16-17; doc. 34, Ex. 50 at 31.)]

15.   When a call comes in from a residence that has been flagged due to prior calls regarding a mentally ill person at the address, information regarding the person, including a physical and behavioral description, would automatically pop up so the dispatcher can then promptly inform the responding officer en route.  [(Doc. 31, Ex. 11 at 35-36, 39-45; doc. 34, Ex. 52 at 103-04.)]

14

16.  In order to get a residence flagged, the Officer on the scene must fill out an alert form kept at the precinct or at police headquarters, give it to his or her supervisor for approval and then send it to the dispatch center to be inputted into the database.  [(Doc. 31, Ex. 11 at 36-37; doc. 34, Ex. 52 at 79-84.)

17.  Documents produced by Defendants indicate Officers can also directly notify dispatch of the need for a flag as shown by a dispatch report stating "the OFCR observed several disturbing characteristics about this subject and feels this house needs to be put on alert to prevent any danger to the home owner or any officer."  [Doc. 34, Ex. 48.)]  No such call was made by any officer on the prior visits to the residence.  [(*Id*.)]

18.  Chief Roper and Lt. Lavender, who is in charge of dispatch, confirmed that there is no policy or procedure governing when to flag events.  [(Doc. 31, Ex. 9 at 29-33; *id*., Ex. 11 at 36, 96-97, 109, 115; doc. 34 at 72-74, 84.)]  However, Lavender testified that signal 78s are generally flagged, and she admitted that Christine's house should have been flagged with an alert because of its repeated history of signal 78 calls.  She could not explain why it was not flagged.  [(Doc. 31, Ex. 11 at 36, 96-97,109, 115.)]

19.  Lt. Lavender testified that she would enter a flag on an address with a prior signal 78, including a description of the mentally disturbed person and his prior violent behavior in order to better prepare Officers for their next encounter with that individual.  [(*Id*. at 43-44.)]

20.  Sgt. [Rodney] Powrzanas, the supervisor of the beat where Christine's house is located, reviewed the September 26, 2008 call (which stated Deron was behaving very aggressively and not taking his medication), and testified he would have "flagged" that residence in order to better prepare Officers responding to future calls there.  [(Doc. 34, Ex. 14; *id*., Ex. 50 at 32, 41-42, 49.)]

21.  Sgt. Powrzanas did not know why the 78 call was not properly recorded in an incident report, nor did he know why it was not flagged.  He has never asked his Officers why they failed to properly document the calls.  [(*id*., Ex. 50 at 32-33.)]

22.  Chief Roper does not know of any signal 78s that have been flagged.  [(Doc. 31, Ex. 9 at 29-33; doc. 34, Ex. 52 at 72-74, 84.)]

23.   Roper testified that he would flag a residence "when it rises to a certain level of criticality of violence," but he does not know of any training provided to officers on the requisite level of violence to warrant a flag.  [(Doc. 34, Ex. 52 at 75.)]

24.   The fact that mentally ill person does not reside at the residence in question, does not affect whether the residence should be flagged.  [(*Id.* at 76.)]

25.   Lt. Lavender admitted the deficiency in the City's policy on informing officers about prior incidents with the mentally ill.[footnote omitted] (Doc. 31, Ex. 11 at 82-83.)]

26.   Chief Roper agreed it is always best for Officer to know the history of the residence they are being called to.  [Doc. 34, Ex. 52 at 100-01.)]

27.   Neither Hutchins nor Mays had knowledge that anyone on the scene was mentally ill.  [(Doc. 31, Ex. 1 at 16; *id.*, Ex. 7 at 103.)]

28.   Before the shooting, neither Hutchins nor Mays knew that officers had been sent the same address to deal with Deron in a mentally disturbed state twice in the last two months.  [(*Id.*, Ex. 1 at 172-74, 190, 225; *id.*, Ex. 7 at 12, 23-24, 99, 106.)]

29.   Had Hutchins known that he would be dealing with a mentally ill person, he would have called a supervisor as the policy directs.  [(*Id.*, Ex. 1 at 195.)]

30.   Mays would have liked to have this information, because it is helpful to know someone's reasoning may not be normal.  Had that residence been flagged the dispatcher would have properly informed him.  [(*Id.*, Ex. 7 at 12, 23-24, 99, 106; doc. 34, Ex. 52 at 106-07.)]

**3.      The Failure to Notify CSO about Prior Incidents and the General Policy of Excluding CSO's from Information Prevented CSO's Ability to Address Deron's Needs and Find Him a Place to Live**

31. Due to the de facto policy of Officers only completing incident reports **18% of the time** (discussed *supra*), CSO's are only notified on **9% of**

**calls** dealing with mentally disturbed persons despite the City policy requiring them to be notified of all such calls.  [(Doc. 34, Ex. 21; *id*., Ex. 53.)]

32.  It is up to the Officer on the scene to notify the CSO.  [(Doc. 11 at 61-62.)]

33.  When the CSO receives referrals, they generally go out to the home and talk with the mentally ill person and others involved, and if the mentally ill person does not have a place to live, help him find one.  [(Doc. 34, Ex. 51 at 42-43.)]  The CSO must have a copy of the incident report to have the mentally ill person committed to get help.  [(*Id*. at 36-37.)]

34. Sgt. Powrzanas admitted the policy requiring all signal 78 incident reports be submitted to the CSO was not and is not followed. [(*Id*., Ex. 50 at 37-38.)]

35.  CSO Nolan also admitted that although policy requires officers to complete an incident report so the CSO can determine whether the person at issue poses a safety risk, that policy is not always followed.  [(*Id*., Ex. 20 at 7; *id*., Ex. 21 at 1-2; *id*, Ex. 51 at 29-33.)]

36.  Chief Roper admitted a CSO should have been notified about the most recent occasions [(August 5, 2008 and September 26, 2008)] where Christine had called the police about Deron in a mentally disturbed state; however, no CSO was notified.  [(*Id*., Ex. 52 at 89.)]

37.  The City denies CSO's access to the data base that shows prior incidents involving a particular mentally ill person at a specific residence. [(Doc. 34, Ex. 51 at 47-48.)

38.  When the CSO receives an incident report on a mentally ill person, the CSO keeps the person's file for a couple of months and then destroys it. She does not have access the data to look into the prior history of that person; rather, she must commit to memory the mentally ill individuals she encounters and the services she provides them.  Other CSO's filling in for her or replacing her have no method of knowing which mentally ill person she has dealt with and what services she provided because they have no system of keeping up with or sharing that information.  [(*Id*. at 49-52.)]

39.  One of the two CSO's assigned to the area of the shooting, Nolan, had not heard of Deron Cook or any incidents at the residence, and had the other CSO dealt with Deron, Nolan would have known.  [(*Id*. at 9, 19-20, 29-30.)]


4.    **Failure to Provide Documented Training to Officers on Dealing with Mentally Ill or Flagging Addresses**

40.  Police Officers receive only perfunctory training at the police academy regarding how to deal with the mentally ill or mentally disturbed. [(Doc. 31, Ex. 9 at 40.)]

41.  Although it is the policy to provide refresher training on how to handle mentally disturbed persons every three years, the City offers no such training.  Refresher training is offered on other subjects, however.  (Doc. 31, Ex. 9 at 40-42, 83; doc. 34, Ex. 20 at 8; *id*., Ex. 52 at 16.)][footnote]

> [Footnote]:  Roper later said in the fall of 2005 they conducted department training on responding to mentally ill, but he does not know where the training was conducted, who attended and what subjects were covered in that training.  [(Doc. 34, Ex. 52 at 5-9.)]

42.  Neither Officers Hutchins, Mays, Ryan, nor their supervisor, Sgt. Powrzanas, had received any training on handling persons with mental illness since they attended the academy, which, for Powrzanas, was 14 years ago. [(Doc. 31, Ex. 1 at 16-17, 87, 176; *id*., Ex. 7 at 17-20; *id*., Ex. 14 at 52; doc. 34, Ex. 50 at 11-12, 39-40, 42-43.)]

43.  Officers are not provided training on how to get an address flagged. Officer Ryan testified he has received no training on how to get an address flagged; he does not know how to get a residence flagged, where to get the paperwork or where to send it.  [(Doc. 31, Ex. 14 at 41-42.)]

44.  Even if a residence is not flagged, Officers are able to check its history by checking with the dispatcher or, if they know how to do that, check the computers in their vehicles, but Sgt. Powrzanas (Hutchins's supervisor) does not know how to do this.  [(Doc. 34, Ex. 50 at 50-51.)]

(Doc. 35 at 7-15 [emphasis in original].)

## F.   CITY'S CUSTOM AND PRACTICE OF FAILING TO INVESTIGATE OFFICER SHOOTINGS

The City has an agreement with the Alabama Bureau of Investigation ["ABI"] to investigate all on-duty shootings of suspects by officers of the Birmingham Police Department. (Doc. 31, Ex. 9 at 101, 110.)

The following facts are deemed undisputed:[10]

85. ABI "investigates the shooting from the standpoint of criminal law, did [the Birmingham Police Department] violate State code . . . ." [(Doc. 31, Ex. 9 at 110.)] According to that policy, the ABI does not render an opinion or conclusion as to whether the shooting was justified; rather, the results of the investigation are turned over to the District Attorney ("DA"), who determines whether there has been a criminal law violation. [(*Id*. at 101; doc. 34, Ex. 35; *id*., Ex. 52 at 30-33, 66.)]

86. Here, the DA's letter indicates the DA is not going forward with the case against Officer Hutchins because the DA would have to prove beyond reasonable doubt that Hutchins committed a felony in killing Osby. The DA's letter does not indicate whether Hutchins violated any police policies. [(Doc. 31, Ex. 10 at 125; doc. 34, Ex. 36.)]

87. The City uses a Firearm Review Committee, ("FRC") to conduct an internal investigation of an officer's shooting and to review facts surrounding the incident to determine if the shooting was within department policy. [(Doc. 34, Ex. 37; *id*., Ex. 52 at 34; doc. 31, Ex. 9 at 108-109, 111.)]

88. The FRC's conclusion in fatal shootings relies on the ABI/DA's determination of whether there has been a criminal law violation. Chief Roper and the City's expert could not identify any occasion where the DA cleared an

_____

[10]See, *supra*, pp. 3-4.

Officer shooting of criminal wrongdoing, but the FRC found the shooting in violation of policy.  Chief Roper explained that it would be very difficult to violate one and not the other.  [(Doc. 34, Ex. 52 at 37-38; doc. 31, Ex. 10 at 126.)]

89.  From 2004 to the present, anytime the FRC determined a policy had been violated, ABI had no involvement in the investigation.  [(Doc. 34, Ex. 52 at 52-60; *id*., Exs. 40-46.)]

90.  Other than possibly talking to the Officers involved in the shooting, the FRC does not interview other witnesses.  [(Doc. 31, Ex. 9 at 109.)]

(Doc. 35 at 22-23.)

Although the ABI interviewed Ms. Leath and the FRC identified her as a witness, the FRC report did not contain her statement or a summary of her statement.  (Doc. 34, Ex. 37; *id*., Ex. 52 at 24, 95-96, 126; doc. 31, Ex. 9 at 112-113.)  The following facts are deemed admitted:[11]

96.  As is the custom and practice, the FRC waited for the DA to issues its finding in order to rely on the DA's determination in completing its own report:  on March 17, 2009, the DA finished its investigation and issued its finding that Hutchins violated no criminal law; the FRC then came out with its report on April 20, 2009, clearing Hutchins of any wrongdoing.  [(Doc. 34, Ex. 52 at 32, 40-41, 45; *id*., Ex. 36.)]

97.  Chief Roper admitted that in order to find that Hutchins shot Osby to protect Deron from serious physical harm, he had to rely solely on Hutchins'[s] version of events, because no other witness statement supported that finding.  [(Doc. 31, Ex. 9 at119.)]

98.  Chief Roper has not read all the statements.  [(*Id*. at 95.)]

_____

[11]See, *supra*, pp. 3-4.

99.  Chief Roper admits that the evidence does not show that Mr. Osby had threatened Officer Hutchins with a fork.  [(*Id*. at 118-119.)]

100.  If Hutchins shot Osby when he was not threatening anyone, then the shooting would be a violation of policy.  [(*Id*. at 121.)]

(Doc. 35 at 24-25.)

## IV.  DISCUSSION

Plaintiff's Amended Complaint contains three claims:  use of excessive force in violation of Mr. Osby's Fourth Amendment rights and violation of Mr. Osby's rights under the Equal Protection Clause of the Fourteenth Amendment, which are actionable pursuant to 42 U.S.C. § 1983, and a claim of wrongful death pursuant to Alabama law.  For the reasons set forth below, the court finds that defendant's Motion for Summary Judgment is due to be granted as to plaintiffs' claims against Officer Hutchins in his official capacity, her excessive force claim against the City, and her equal protection claims against both defendants; it is due to be denied as to her § 1983/excessive force claim against Officer Hutchins in his individual capacity and her state-law wrongful death claim.

## A.  EXCESSIVE FORCE

In her Amended Complaint, plaintiff alleges that defendants used "excessive and unreasonable" force against Mr. Osby in violation of his Fourth Amendment right to be free from unreasonable seizure.  (Doc. 14 ¶¶ 28-29.)  Specifically, plaintiff contends that Officer Hutchins shot Mr. Osby, who was unarmed and did not pose a threat to Officer Hutchins or

21

to any other person, in the back without warning and that this conduct was unreasonable. Also, she claims the City's policy and or custom, or lack thereof, caused Mr. Osby's death.

### 1. Officer Hutchins

#### a. Official Capacity

Plaintiff has sued Officer Hutchins in his official capacity as an officer of the Birmingham Police Department; she has also sued the City of Birmingham.  In *Kentucky v. Graham*, the Supreme Court clarified the distinction between a suit against an individual in his personal capacity and a suit against that individual in his official capacity:

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

*Graham*, 473 U.S. 159, 166 (1985)(internal citations and quotations omitted).  The Eleventh Circuit has recognized this principle's application to local government entities: "For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents."  *Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir.1989).  When suit is also filed against the local government entity, the court should dismiss the individual defendant in his official capacity as "redundant and possibly confusing to the jury."  *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir.1991).

22

In this case, the claims against Officer Hutchins in his official capacity are duplicative of the claims against the City. Therefore, plaintiff's claims against Officer Hutchins in his official capacity are due to be dismissed.

Defendants' Motion for Summary Judgment as to all claims against Officer Hutchins in his official capacity will be granted.

### b. Personal Capacity

Officer Hutchins contends that the § 1983 claims against him in his personal or individual capacity are due to be dismissed on the basis of qualified immunity. (Doc. 2 ¶ 10.)

> When government officials act in a way that knowingly violates a clearly established statutory or constitutional right of which a reasonable person would have known, they are not immune from suit and may be held liable for the damage their actions caused. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). But when these same officials make decisions that do not knowingly violate such rights, they are not required to defend themselves in a lawsuit seeking damages. *Id*. They are "immune" from suit. *Id*. We call this defense "qualified immunity" because the official is immune from a damage lawsuit, qualified upon his ability to show that he did not knowingly violate the plaintiff's clearly established constitutional right. *Id*.

*Ray v. Foltz*, 370 F.3d 1079, 1081-82 (11th Cir. 2004). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Carr v. Tatangelo*, 338 F.3d 1259, 1266 (11th Cir. 2003)(quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)(quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)))(internal citations and quotations omitted.).

The Eleventh Circuit uses a two-step analysis to determine whether a public official has qualified immunity: (1) the public official must establish that he was acting within the

23

scope of his discretion; and (2), if the public official establishes that he was acting within his discretion, the plaintiff must show that the public official violated clearly established statutory or constitutional law.  *Wood v. Kesler*, 323 F.3d 872, 877-78 (11th Cir. 2003); *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1236 (11th Cir. 1992).  For purposes of the § 1983 claims, the parties do not dispute that Officer Hutchins was acting within his discretion; therefore, the issue for the court is whether his actions violated clearly established constitutional law.

Whether Officer Hutchins's actions violated clearly established constitutional law also "consists of a two-part inquiry."  *Harris v. Coweta County, Ga.*, 433 F.3d 807, 812 (11th Cir. 2005)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

> First we ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" [*Saucier*, 533 U.S. at 201]  If, assuming the plaintiff's allegations were true, no such right would have been violated, the analysis is complete.  However, if a constitutional violation can be made out on the plaintiff's facts, [the court] then must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004)(citing *Saucier*, 533 U.S. at 201-02).

*Id.*

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."  *Hope*, 536 U.S.

at 736.[12]   In a civil action brought pursuant to § 1983, the plaintiff bears the burden of demonstrating a constitutional violation.  *Harris*, 433 F.3d at 811(citing *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002)); *Kesler*, 323 F.3d at 877-78.

"[A] claim of excessive force in the course of making a seizure of the person is properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Scott v. Harris*, 550 U.S. 372, 381 (2007)(quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989))(internal quotations omitted).  "A Fourth Amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989))(internal quotations omitted).  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)(citing *Graham*, 490 U.S. at 394).

In determining whether an officer's use of force is excessive, "[t]he question is whether the officer's conduct is objectively reasonable in light of the facts confronting the

---

[12]The Supreme Court has limited *Saucier's* mandate that a district court **must** decide the question of qualified immunity by deciding first if there has been a constitutional violation.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").  In this case, the court finds the *Saucier* sequence is appropriate.

officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (citing *Graham*, 490 U.S.

at 394)).   The reasonableness of the use of force is measured objectively and it is "judged

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight."  *Graham,* 490 U.S. at 397; *Penley v. Eslinger*, 605 F.3d 843, 852 (11th Cir.

2010); *Crenshaw v. Lister*, 556 F.3d 1286, 1290 (11th Cir. 2009).   Examination of the

objective reasonableness of the force used allows for consideration of the circumstances in

light of the fact that "police officers are often forced to make split-second judgments – in

circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that

is necessary in a particular situation."  *Oliver*, 586 F.3d at 905-06 (citing *Graham*, 490 U.S.

at 396-97).

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)(quoting *United*

*States v. Place*, 462 U.S. 696, 703 (1983))(internal citations and quotations omitted).  "As

[the Eleventh Circuit] has clarified, the second factor [– whether the suspect poses an

immediate threat to the safety of the officers or others –] can be reduced to a single question:

whether, given the circumstances, [the suspect] would have appeared to reasonable police

officers to have been gravely dangerous."  *Penley*, 605 F.3d at 851 (quoting *Pace v.*

*Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002)).

> [T]he use of deadly force is more likely reasonable if:  the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force.  But . . . none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect.

*Id*. at 851 (citing *Scott*, 550 U.S. at 382; *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985))(internal citations omitted); *see also Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005).

Defendants contend that Officer Hutchins saw Mr. Osby attack Deron Cook with a deadly weapon and that he ordered Mr. Osby to drop the weapon.  When Osby did not drop the weapon, Officer Hutchins shot him in the back and killed him.  However, plaintiff's evidence disputes defendants' recitation of the events surrounding the shooting.

Plaintiff has presented evidence from which a jury could find that Officer Hutchins knew Deron Cook was the aggressor, not Mr. Osby.  Plaintiff's evidence also supports a finding that Officer Hutchins did not give any warning before shooting Mr. Osby.  Also, even if the jury found Officer Hutchins had commanded Mr. Osby to drop the fork, he shot him less than a second later, not giving Mr. Osby time to acquiesce.  Moreover, a reasonable jury could find Mr. Osby posed no threat to anyone at the time of the shooting because Deron Cook had left the room and, at the time, Mr. Osby was trying to stand up and put down the weapon – facts that would be evident to a reasonable officer in the position of Officer Hutchins.  Based on this evidence, a jury could find that any reasonable police officer in the

27

same position as Officer Hutchins would not have exercised deadly force in violation of Mr.

Osby's Fourth Amendment rights.

Having found that plaintiff has made a sufficient showing of unconstitutional excessive force, the second step in the *Saucier* analysis requires the court to determine whether Officer Hutchins is entitled to qualified immunity because the law was not clearly established at the time of the shooting that use of such force under the circumstances was excessive.  Officer Hutchins is not entitled to qualified immunity if, "at the time of the incident, every objectively reasonable police officer would have realized the acts violated clearly established federal law." *Harris*, 433 F.3d at 812 (citations omitted).  The Eleventh Circuit has held that a plaintiff can establish that the law was clearly established in two ways:

> The first is to point to a materially similar case that has already decided that what the police officer was doing was unlawful.  Because identifying factually similar cases may be difficult in the excessive force context, [the Eleventh Circuit has] recognized a narrow exception also allowing parties to show that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.  Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and [Eleventh Circuit] case law inevitably lead every reasonable officer in the defendant's position to conclude the force was unlawful.

*Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)(internal quotations and citations omitted.)

"In the context of Fourth Amendment excessive force claims, [the Eleventh Circuit has] noted that generally no bright lines exists for identifying when force is excessive; [the

Eleventh Circuit has] concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (citing *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)).  The narrow exception to this rule is where the plaintiff shows that "the official's conduct lies so obviously at the core of what the Fourth Amendment prohibits," and "was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Id.* (citations omitted).  Under either test, "pre-existing law must dictate, that is, truly compel (not just suggest or raise a question about), the conclusion" that every like-situated reasonable officer would consider the officer's actions, in question, constituted a violation of the law.  *Id.*  When reviewing caselaw, in this context, the court is limited to decisions of the United States Supreme Court, the Eleventh Circuit, or the highest court of the relevant state that were issued as of the date of the conduct in question.  *Vinyard*, 311 F.3d at 1351-52 and n.22.

Viewing the evidence in the light most favorable to plaintiff, any reasonable officer on the scene would have known that Mr. Osby was a victim and not the aggressor.  Also, Mr. Osby was not threatening anybody, the altercation with Deron Cook had ended, and Deron Cook was no longer in the kitchen when Officer Hutchins shot Mr. Osby.  Moreover, Officer Hutchins and his partner, Officer Mays, were within feet of Mr. Osby, with their guns drawn, presumably capable of stopping Mr. Osby should he suddenly pose a threat.  The court notes

29

that Officer Mays testified that Officer Hutchins shot Mr. Osby less than a second after

saying something to him; he did not give Mr. Osby sufficient time to comply before shooting

him.  Therefore, viewing the evidence in the light most favorable to the plaintiff, a reasonable

officer would not have deemed Mr. Osby to be an immediate threat to his safety or the safety

of others.  Also, because Mr. Osby had only a fork, which Officer Hutchins testified he

thought was a knife, and because Deron Cook was no longer in the room, any reasonable

officer in Officer Hutchins position, must have known that the situation did not call for the

use of deadly force.

> The Supreme Court has held:

> > Specifically with regard to deadly force, we explained in *Garner*[13] that
> > it is unreasonable for an officer to seize an unarmed, nondangerous suspect by
> > shooting him dead.  But where the officer has probable cause to believe that
> > the suspect poses a threat of serious physical harm, either to the officer or to
> > others, it is not constitutionally unreasonable to prevent escape by using deadly
> > force.

*Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004)(quoting *Tennessee v. Garner*, 471 U.S.

1, 11 (1985))(internal citation and quotations omitted). Specifically, the Supreme Court in

*Garner* held:

> > Where the officer has probable cause to believe that the suspect poses a threat
> > of serious physical harm, either to the officer or to others, it is not
> > constitutionally unreasonable to prevent escape by using deadly force.  Thus,
> > if the suspect threatens the officer with a weapon or there is probable cause to
> > believe that he has committed a crime involving the infliction or threatened

---

[13]*Tennessee v. Garner*, 471 U.S. 1 (1985).

infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12.  "[A]n officer will be entitled to qualified immunity if he had "arguable probable cause" to employ deadly force; [therefore, the court must] decide whether "the officer reasonably could have believed that probable cause existed" to use deadly force. *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003)(citations omitted).

At the time of the shooting in 2008, the Eleventh Circuit, for over twenty years, had recognized "that shooting a suspected felon who was apparently neither fleeing nor threatening the officers or others was – even in July, 1983 – an unreasonable seizure and clearly violated fourth amendment law."  *See Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987)(footnote omitted).[14]

_____

[14]In the *Lundgren* case, a police officer had shot and killed a store owner under the following circumstances:

On July 10, 1983, a front window of the Marianna Video Store was broken.  Owner Richard Lundgren cleared the broken glass and replaced it with a sheet of plywood.  That night, Richard and his wife, Margaret, slept in the store behind a desk.

At around 2:00 a.m. on July 11, 1983, deputy sheriffs Davis and Cloud noticed the broken window, and suspected that a burglary was in progress.  They entered the store without announcing themselves.  The store was only faintly illuminated by a television.

What happened next is sharply disputed by the parties.  At trial, deputy Davis testified that he saw a large shadow or silhouette rise up from behind a desk, saw a flash of light from a gun, and felt a blast of hot air on his forehead.  After being shot at, Davis testified, he fired three times in return.  When the shooting stopped, Davis went around the desk, shining his flashlight.  He saw

Richard lying with blood trickling from his head and saw a gun on the floor. Davis testified that Margaret then reached for this gun and that he told her not to touch it. Although Davis testified at trial that Margaret Lundgren fired the initial shot, in a prior statement to an investigator, Davis indicated that Richard Lundgren fired the first shot.

. . .

On direct examination at trial, Margaret Lundgren testified that she woke up her husband when she heard someone walking on the broken glass outside the store. Margaret testified that as her husband Richard "was raising up someone started shooting and [Richard] was shot." According to Margaret's testimony on direct examination, Richard did not get "all the way above the desk" before he was shot; Richard never fired a shot; and she never fired a shot. Also, Margaret denied having later reached for a gun.

On cross examination, Margaret testified that she never saw Richard reach for a gun. When confronted by her prior deposition statement that "I recall him reaching for his gun," Margaret retracted, saying that she did not know whether Richard reached for a gun and that Richard could have fired a shot. Margaret also testified that Richard "never really had a chance to get up off the floor."

Forensic examination revealed that Richard Lundgren had been struck by one bullet in the right temple and that this bullet had first passed through the desk. Investigators found no physical evidence suggesting that Richard or Margaret had fired a shot. The pistol found in the store had lint in the barrel. No ejected shell casings were found. No gunshot residues were found on Richard's hands.

. . .

. . . Whether plaintiff or the decedent stood up behind the desk, threatened the officers with a weapon, or fired a shot, were and are sharply contested by the parties.

The jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that *the officers without provocation shot at a*

32

In this case, as set forth above, the facts, viewed in the light most favorable to plaintiff, support a finding that Hutchins knew that Osby was not suspected of any crime and was actually a victim; that he did not pose a threat to Hutchins, another officer, or other person; that he was not resisting arrest or attempting to escape; and that a warning and chance to comply were feasible under the circumstances. A reasonable jury could find that Officer Hutchins "without provocation shot at a nondangerous suspect." *Lundgren*, 814 F.2d at 603. Since 1983, every reasonable officer in Officer Hutchins's position would have known that the use of deadly force against Mr. Osby under the circumstances was unconstitutional.

The court finds that Officer Hutchins is not entitled to qualified immunity. Therefore, defendants' Motion to Dismiss on the grounds of qualified immunity will be denied.

## 2.  City's Liability

The Supreme Court has strictly limited a municipality's liability under Section 1983. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)). In *Monell*, the Supreme Court held that municipalities are "persons" within the meaning of § 1983 and "may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." *Monell*, 436 U.S. at 691;

---

> *nondangerous suspect*. Indeed, this is apparently what the jury did conclude . . . .

*Lundgren v. McDaniel*, 814 F.2d 600, 602-03 (11th Cir. 1987).

33

*Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009). A city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*. *Monell* 436 U.S. at 691. A plaintiff may establish municipal liability in three ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.

*Gillette v. Delmore* 979 F.2d 1342, 1346 -1347 (9th Cir. 1992)(quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) and citing, *inter alia*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24 (1988)(plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); *Monell*, 436 U.S. at 690-91 )(internal citations and quotations omitted).

Plaintiff alleges that the City is liable because of its policies and/or customs of police interaction with mentally-ill individuals and of not investigating the use of deadly force by its police officers.

### a. Custom or policy – Mentally-Ill Suspects

Plaintiff contends:

> [T]he City [has] failed to train officers on how, specifically, to handle persons with mental illness when they encounter them, [and] the City has also utterly failed to adopt and implement a policy that tracks its encounters with

34

mentally ill persons requiring repeated intervention, so that its police officers and social workers (CSO's) can properly and safely respond to disturbances caused by such persons and issue the appropriate corrective action. The failure to adopt and implement a policy or practice of adequately preparing first responders to these situations, combined with the failure to train officers in the first place, results in a standard of care well below the contemporary standard for police departments and leads to the entirely foreseeable consequence of unnecessarily violent and deadly encounters between the police and the mentally disturbed and their families, as with Osby.

(Doc. 35 at 34-35.)  Based on the evidence presented, the  court assumes, for purposes of summary judgment only, that "neither the police officers, police dispatch CSO's, nor supervisors are trained on how to properly interact with, respond to, prepare for, or keep track of persons with mental illness at residences repeatedly requiring police intervention," and, "[i]n addition to failing to keep its Officers informed about potentially violent mentally ill people they may encounter at certain residences, the City also fails to notify the very employees it hires to assist its mentally ill citizens – the CSOs, thus preventing them from doing their job."  (*See id*. at 37.)  Plaintiff contends that these failures directly caused Mr. Osby's death; she argues:

> Here, the city's complete failure to train or otherwise prepare its officers to approach a potentially violent situation involving a mentally ill person, and to even apprise the officers that they were entering a residence where a mentally ill person had repeatedly exhibited violent and erratic behavior of which the city had been repeatedly made aware, led to the entirely foreseeable consequence that the officers, believing they had been called to stop a domestic dispute, entered the residence, guns ablaze, and responded with excessive, deadly force.  Had they been aware that the call was regarding a mentally ill person with a history of aggressive behavior and had they been properly trained on how to deal with such persons, then the situation would likely not have resulted in the tragic death of Reginald Osby.  Had the CSOs been properly notified regarding the multiple instances of Deron's erratic

35

behavior based on Christine's previous emergency calls, he may have been in
a proper home or involuntarily committed, removing him, and Osby, from the
dangerous situation leading to Osby's death.

(*Id.* at 43.)

In order for the City to be liable, plaintiff must prove a direct causal link between the policy and/or custom at issue and Mr. Osby's death. *Brown*, 520 U.S. at 404; *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989); *City of Canton*, 489 U.S. at 385. The policy and/or custom – or lack thereof – "must be closely related to the ultimate injury" – Mr. Osby's death. *City of Canton*, 489 U.S. at 391. "The connection between conduct and harm must be legally sufficient to satisfy notions of common fairness and policy." *Dixon v. Burke County*, 303 F.3d 1271, 1275 (11th Cir. 2002). The City's "deliberate conduct" must be "the moving force behind the injury." *Brown*, 520 U.S. at 404.

The court finds that the City's lack of a policy for handling mentally-ill suspects or its custom of not flagging residences or contacting CSOs did not cause Officer Hutchins to use excessive force in this case. Mr. Osby was not mentally ill and he did not have a history of mental illness. Officer Hutchins thought, erroneously, that Mr. Osby was the aggressor and that he had a weapon. The evidence indicated that Officer Hutchins had been told that Ms. Leath's son was mentally ill and that he was the aggressor. Officer Hutchins shot Mr. Osby without warning him in spite of the fact that Deron Cook had left the area and Mr. Osby was only moving to put down the fork. The evidence does not support an inference that Officer Hutchins contemplated his course of action and nothing in the record supports a

36

finding that he would have behaved any differently if he had known before arriving on the scene that Deron Cook was mentally ill.  The argument that Deron Cook was mentally ill and may have been institutionalized at the time of the incident had officers responded differently on prior occasions is too remote and too speculative to support a finding that such failure to act caused Officer Hutchins to shoot Mr. Osby on October 12, 2008.

Accordingly, the court finds that plaintiff has not submitted sufficient evidence from which a jury could infer that Hutchins's use of excessive force was caused by or resulted from a policy or custom of the City regarding mentally ill individuals.  Thus, as to those claims, the City is entitled to an entry of judgment in its favor, as a matter of law, and defendants' Motion for Summary Judgment as to plaintiff's excessive force claim against the City is due to be granted.

> **b.   Failure to Investigate Prior Uses of Deadly Force by Birmingham Police Officers.**

Plaintiff contends, "The City of Birmingham is also responsible for Hutchins'[s] use of excessive deadly force because it failed to formulate and execute an internal administrative review of officer shootings and to discipline those who have been found to unreasonably use deadly force."  (Doc. 35 at 45 [citing *Fields v. Nawotka*, No. 03-CV-1450, 2008 WL 746704 (E.D. Wis. Mar. 18, 2008)].)  She contends:

> In *Fields*, the plaintiffs' *Monell* claims were also based upon the failure of the Police Department's policy makers to formulate and execute an internal administrative review of officer shootings and discipline those that have been found to unreasonably use deadly force.  2008 WL 746704, *8.  The District Court held that the plaintiffs had presented sufficient evidence of the

programs' inadequacy to survive summary judgment.  Namely, the plaintiffs's evidence indicated that, *inter alia*, the Police Department's "inquest" process after fatal shootings was inadequate because its "reliance on criminal proceedings and the prosecutor's filing decision – which utilize a much higher standard burden of proof – is unreasonable and inconsistent with generally accepted police supervisory practices." *Id*.  This inadequate inquest process allowed an environment for the use of unreasonable force, because officers may have believed they will not be held accountable for the consequences of using deadly force.   In addition, this failure to conduct an internal administrative investigation after the use of deadly force constituted deliberate indifference against citizens by the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens. *Id*.  "These acts, omissions, and acquiesces . . . created an environment which would allow an officer to engage in improper use of deadly force [and were factors that] were significant and causal" in the civilian death at issue in that case.  *Id*. at *8-9.

(Doc. 35 at 45-46.)

The *Fields* decision, which is not binding on this court, found that plaintiff had established a question of fact regarding causation based on the testimony of an expert witness.  The Wisconsin district court held:

> The plaintiffs argue that the City of Milwaukee and former Milwaukee Police Department Chief Arthur Jones failed to institute an authentic administrative review of officer-involved shootings of civilians and failed to discipline officers for unreasonable uses of deadly force.  The plaintiffs' expert, Lou Reiter, states that the defendants' internal affairs investigation was contingent on the outcome of the district attorney's office criminal investigation and that this practice is unreasonable and inconsistent with generally accepted police supervisory practices.
>
> A municipality may only be constitutionally liable under § 1983 for violations caused by the municipality itself through its own policies and customs.  *Monell*, 436 U.S. at 694.  Although a municipality may be liable under this "policy or custom" theory, there must be a causal link between the

38

constitutional violations and the municipality's actual policies or customs.  *See id*.  A municipal practice may be actionable under § 1983 if a plaintiff can establish that the policy or decision making acquiesced in a pattern of unconstitutional conduct.  *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir.1993).

The plaintiffs set forth that their claims are not based upon a failure to train; rather, they are based upon the failure of the Milwaukee Police Department's policy makers to formulate and execute an internal administrative review of officer shootings and discipline those that have been found to unreasonably use deadly force.  Plaintiffs argue this failure amounts to a constitutional deprivation because:  (1) it creates a *de facto* custom of unreasonable use of deadly force; (2) it is contrary to written policy and accepted police practices; and (3) it authorizes the unreasonable use of deadly force.   The plaintiffs argue that the Milwaukee Police Department's shortcomings amount to "deliberate indifference" and an actionable § 1983 municipality claim.  *See Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

The court determines that, based upon this theory, there is a genuine issue of material fact that precludes summary judgment.  Viewing the evidence in the light most favorable to the plaintiffs, the court determines that there is a material factual issue regarding the police department customs.  Unlike this court's previous decisions relating to *Monell* claims for a failure to investigate, ***the plaintiffs articulate and present evidence about Milwaukee Police Department's investigation practices that could establish their inadequacy***.  *See Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007).

***The plaintiffs' retained expert, Lou Reiter, averred that the Milwaukee Police Department has a policy of inadequate investigation that allows an environment for the use of unreasonable force because officers may believe they will not be held accountable for the consequences of using deadly force***. (Reiter Aff'd ¶ 5.)  Reiter further states that the Milwaukee Police Department may have had notice of this inadequate policy as early as 1992, and, in spite of opportunities to amend its policies, it has not done so. (*Id*. ¶¶ 7-10.)  Reiter also criticizes the "inquest" process after fatal shootings because this process involves a burden of proof beyond a reasonable doubt and argues that the "reliance on criminal proceedings and the prosecutor's filing decision – which utilize a much higher standard burden of proof – is unreasonable and inconsistent with generally accepted police supervisory

practices." (*Id.* ¶ 14.)  Finally, Reiter concludes that the failure to conduct an internal administrative investigation after the use of deadly force incidences

> constitutes deliberate indifference against citizens by the ratification of egregious police field practices known within the law enforcement industry to result in unreasonable uses of force and deadly force resulting in fatal injuries to citizens . . . .  These acts, omissions, and acquiesces . . . created an environment which would allow an officer to engage in improper use of deadly force [and were factors that] were significant and causal in the death of Justin Fields.

(*Id.* ¶ 15.)  The defendants claim that the internal review process is adequate and even if it were not, there was no causal link between the Milwaukee Police Department's failure to investigate and Fields'[s] death.  However, the court finds that the plaintiffs' record evidence and supporting affidavits create genuine issues of material fact as to whether or not the investigation process did create a *de facto* policy of ratifying officer use of deadly force; ***the court further finds that the plaintiffs' submissions create a genuine issue for trial regarding the causal link between the review process and the fatal shootings***.  In sum, given the material factual disputes, summary judgment on the plaintiffs' *Monell* claims is inappropriate.

*Estate of Fields v. Nawotka*, 2008 WL 746704, 7-9 (E.D. Wis. 2008)(emphasis added).

Plaintiff has not presented expert testimony of an "affirmative link" between the City's investigation of its officers' use of deadly force and Officer Hutchins's shooting of Mr. Osby.  *See Brooks v. Scheib*, 813 F.2d 1191, 1195 (11th Cir. 1987).  Plaintiff must show some evidence that a different system for investigating officers' use of deadly force would have prevented Mr. Osby's death.  *Id.*; *see also Gold v. City of Miami*, 151 F.3d 1346, 1353 (11th Cir. 1998)(citing *Brooks*).  Such evidence is not before the court.

40

Therefore, as to the claims that the City's policy or custom of investigating on-duty shootings caused Officer Hutchins to use excessive force in this case, defendants' Motion for Summary Judgment will be granted.

## B.  EQUAL PROTECTION

Plaintiff's Amended Complaint alleges:

39.  The Birmingham City Police Officers who responded in person to a call to Mr. Osby's residence on October 12, 2008, are all white males.  [Mr.] Osby was a black male.

40.  Defendant City ratified, sanctioned and/or condoned the conduct of the white police officers who responded in person to [Mr.] Osby's home on October 12, 2008, including the fatal shooting of [Mr.] Osby and thus Defendants unlawfully subjected [Mr.] Osby to discrimination on the basis of his race.  Defendants' actions deprived [Mr.] Osby of his right to equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. [§] 1983.

41.  The actions and inactions of Defendants in relation to the events of October 12, 2008, and the fatal shooting of [Mr.] Osby were part of a pattern and practice and custom of denying appropriate protective services to minorities and, as such, constitute a denial of [Mr.] Osby's right to equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States.

(Doc. 14 ¶¶ 39-41.)[15]

---

[15]Defendants argue that plaintiff has raised an equal protection claim based on the disparate treatment of mentally-ill individuals.  The court notes that plaintiff did not "claim an Equal Protection violation based on mental illness."  (Doc. 42 at 8.)

### 1.  Officer Hutchins

#### a.  Official Capacity

For the reasons set forth, the court finds that claims against Officer Hutchins in his official capacity are redundant of claims against the City for violations of Mr. Osby's equal protection rights.  Therefore such claims will be dismissed.

#### b.  Individual Capacity

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.  *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)(quoting U.S. Const., amend. XIV; citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  To prove a claim based on a violation of the Equal Protection Clause of the Fourteenth Amendment, plaintiff must allege and prove that "'through state action, similarly situated persons have been treated disparately,'" and "that [Officer Hutchins's] actions were motivated by race."  *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004)(quoting *Thigpen v. Bibb County Sheriff's Department*, 223 F.3d 1231, 1237 (11th Cir. 2000), *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)); citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977)); *see also Austin v. City of Montgomery*, 353 Fed. Appx. 188, 191 (11th Cir. 2009) *GJR Investments, Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367-68 (11th Cir. 1998). "Evidence which

merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent." *Hope v. Allen*, Civil Action No. 2:07cv210-MHT, 2009 WL 1688177, *010 (M.D. Ala. June 16, 2009)(citing *McKleskey v. Kemp*, 481 U.S. 279, 292 (1987))(Walker, M.J., Report and Recommendation).

Defendants contend that plaintiff's equal protection claim against Officer Hutchins is due to be dismissed because Officer Hutchins is not white, but he is a Native American. (Doc. 31 at 30.) However, Officer Hutchins's race, which is not the same as Mr. Osby's race, which is African-American, is not particularly relevant to whether plaintiff's equal protection claim can survive defendants' Motion for Summary Judgment. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998)(the Supreme Court held "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group")(quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)). Nothing in this record creates a presumption that Officer Hutchins would not discriminate against African-Americans because he is of Native American descent and not white.

Defendants also contend that plaintiff has not presented evidence of similarly-situated individuals or that Officer Hutchins was motivated by racial animus. Plaintiff contends, "There is ample evidence that Hutchins treated black suspects much less favorably that [sic]

43

whites and that the City was aware of his discriminatory actions but took no steps to stop them." (Doc. 35 at 53-54.)  She contends:

> For example, Hutchins has been accused of racial profiling related to a stop he conducted of an African-American man driving a nice car.  This man submitted a statement stating "Officer Hutchins and his partner (have) serious issues with the African American race (and they) . . . hate and despise black people".  (EX. 16; Hutchins at 19-22, 47-48.)  The man filed a lawsuit as a result of this stop, but it was dismissed because his attorney took no depositions and presented no response to defendants' Motion for Summary Judgment.  The issue of racial profiling was not mentioned in the Complaint or the Opinion.  (EX. 16; Hutchins at 19-22, 47-48.)  Therefore, contrary to Defendants' suggestion otherwise, no finding was reached regarding whether Hutchins stopped the man because of his race.  (EX. 38, Def. EX. 15.)  The City was aware of this complaint against Hutchins, but either ignored it or took steps to conceal its true nature:  Defendants' combined report of complaints on Officer Hutchins states only that this complaint regarded "Alleges ofcr was rude towards him"; it fails to mention the allegation of racial profiling.  (EX. 39.)
>
> In addition, Hutchins has a history of using force against African Americans:  in February 2004 he tased a black male; in May 2005 he tased another black male; in October 2006 he kneed a black male; in June 2007 he tased a third black male; in April 2007 he tased  a fourth black male; and in April 2009 he tased a fifth black male.  (Hutchins at 35-37, 67-68, 73-74; EXs 3, 7, 23, 24, 25, 28.)  Hutchins could not identify a single instance of using force against a white male.  (Hutchins at 66-67, 71-72.)
>
> This evidence is sufficient for a jury to conclude that Hutchins's unjustified use of excessive, lethal force against Osby was motivated by his demonstrated racial animus, known to the Police Department but ignored and/or condoned.  This claim should go to a jury.

(Doc. 35 at 54-55.)

One incident of alleged racial profiling and seven incidents of Officer Hutchins's use of force against black males over a six-year period, without any evidence regarding similar

44

incidents involving white males where force was not used, does not provide sufficient evidence from which a reasonable jury could infer that Officer Hutchins shot Mr. Osby because he was African-American. *See Swint v. City of Wadley*, 51 F.3d 988, 1000 (11th Cir. 1995)("Absent some evidence of racially disproportionate arrests compared to the actual incidence of violations by race, there is no basis for inferring racially selective law enforcement."); *see also Urbanique Production v. City of Montgomery*, 428 F. Supp. 2d 1193, 1224 (M.D. Ala. 2006)(citing *Swint*, 51 F.3d at 1000; also citing *United States v. Bell*, 86 F.3d 820, 823 (8th Cir.1996); *United States v. Duque-Nava*, 315 F. Supp. 2d 1144, 1152 n.15 (D. Kan. 2004)).  Without evidence that Officer Hutchins encountered white males under the same or similar circumstances and did not use the same or similar force, plaintiff cannot show that Officer Hutchins treated white individuals more favorably than black individuals with regard to his use of force.

Based on the foregoing, the court finds plaintiff has not shown Officer Hutchins violated Mr. Osby's equal protection rights.  Therefore, defendants' Motion for Summary Judgment as to Count II of plaintiff's Complaint against Officer Hutchins in his individual capacity will be granted.

### 2. The City

Because the court has found that plaintiff has not established a violation of Mr. Osby's equal protection rights by Officer Hutchins, summary judgment is due to be granted as to her Equal Protection Clause claim against the City.  *See Urbanique Production*, 428 F. Supp. 2d

at 1225 ("Municipal liability is foreclosed on Plaintiffs' Fourteenth Amendment claim against the City because the court has concluded that no underlying equal protection violation was committed by [the individual defendants] as to the events at issue in this case."); *see also Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996)("An inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."); *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise.").

Therefore, defendants' Motion for Summary Judgment as to Count II of plaintiff's Complaint against the City will be granted and plaintiff's Equal Protection claim will be dismissed.

## C.  WRONGFUL DEATH

Plaintiff alleges:

44.   This is a claim brought pursuant to 6-5-410 of the Code of Alabama for the wrongful death of Reginald W. Osby.

45.   Osby died on October 12, 2008, at the age of 59 years.  The direct proximate cause of Osby's death was the Defendants' negligent, wanton or willful acts and omissions.

46.   Defendant Hutchins'[s] shooting of Osby in the back was the direct proximate cause of Osby's death.  Hutchins'[s] actions were negligent, careless, unskillful, reckless, willful and/or wanton.  Defendant City is responsible for the actions of its actions, including Officer Hutchins, under respondeat superior.  Defendant City is also responsible itself for negligently training and supervising its employees, including Officer Hutchins.  The City's actions and omissions were negligent, careless, unskilled, reckless, willful

46

[and/or] wanton.  These acts and failures to act resulted in Osby's wrongful death.

(Doc. 14 ¶¶ 44-46.)  Defendants contends that they "are entitled to state-agent immunity."

(Doc. 30 ¶ 13.)  They argue:

> Alabama law provides immunity from liability to law enforcement officers for discretionary acts while acting in the line and scope of their duties.  Hutchins is treated as an officer of the state and has immunity from tort liability arising out of his performance of discretionary functions within the line and scope of his law enforcement duties.  This law extends immunity to peace officers, and as Hutchins'[s] employer, the City is afforded the benefit of his immunity.

(Doc. 31 at 44 [citing Ala. Code § 6-5-338; *Ex parte City of Gadsden*, 781 So. 2d 936, 940

(Ala. 2000).

Alabama's law of immunity for municipalities and their peace officers is not a model

of clarity.  The Eleventh Circuit recently discussed the basics:

> Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities."  *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002).  In *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which bars suit against law enforcement officers effecting arrests, except to the extent the officer acted willfully, maliciously, fraudulently, in bad faith, beyond his legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise.  *Id*. at 405.
>
> There is also statutory, discretionary-function immunity in Alabama.  Specifically, § 6–5–338 of the Alabama Code contains a provision immunizing law enforcement officers from tort liability for conduct within the scope of

their discretionary law enforcement duties.[16]  Ala. Code § 6–5–338(a) (1994) ("Every peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.").  *Cranman*'s test for state-agent immunity governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6–5–338(a).  *Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala.2005) ("The restatement of State-agent immunity as set out in *Cranman*, 792 So. 2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6–5–338(a)."). . . .

The Alabama Supreme Court established a burden-shifting framework for application of the state-agent immunity test.  A defendant initially bears the

---

[16]Section 6-5-338(a) and (b) state:

(a)  Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such *shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties*.

(b)  *This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers*. No immunity is extended hereby to any private non-governmental person or entity, including any private employer of a peace officer during that officer's off- duty hours.

Ala. Code § 6-5-338 (a) & (b)(emphasis added).

48

burden of demonstrating that he was acting in a function that would entitle the agent to immunity. *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id*.

*Brown v. City of Huntsville*, 608 F.3d 724, 740-41 (11th Cir. 2010).

The Alabama Supreme Court has "held that officers do not have discretion, in the exercise of their judgment, to make an arrest if there is no arguable probable cause." *Mann v. Darden*, 630 F.Supp. 2d 1305, 1317 (M.D. Ala. 2009)(citing *Borders v. City of Huntsville*, 875 So. 2d 1168, 1180 (Ala. 2003)). "[M]uch like making an arrest without arguable probable cause, using an unreasonable amount of force is not within the discretion of an officer." *Id*. at 1318 (citing *Franklin*, 670 So. 2d at 852 ["motion for summary judgment should have been granted [in favor of the peace officer defendant] *only* if [plaintiff] presented no substantial evidence to create a genuine issue of material fact as to whether probable cause existed to make a lawful arrest *or as to whether the force used was excessive*" (emphasis added)].) "While the use of force is typically within the discretion of an officer . . ., the use of unreasonable and egregious levels of force is not." *Id*. Therefore, "if the evidence seen in the light most favorable to [plaintiff] suggests that no reasonable officer could have thought the degree of force was acceptable, then [Hutchins] was not acting within his discretion and is not entitled to discretionary-function immunity."[17] *Id*.

---

[17]The *Mann* court recognized that this analysis of the scope of the agent's discretion differs from the federal court qualified immunity analysis. *Mann*, 630 F. Supp. 2d at 1318 n.8.

As set forth above, viewing the facts in the light most favorable to plaintiff, a reasonable jury could find "that no reasonable officer could have thought the degree of force [used by Hutchins] was acceptable, and therefore, he acted outside his authority. *Id*. As a result, Hutchins is not immune under § 6-5-338 and the *Cranman* doctrine. Because Hutchins is not immune, the City is not entitled to immunity pursuant to § 6-5-338.

Defendants cite Ala. Code § 11-47-190, as support for their argument that the plaintiff's claim for punitive damages should be dismissed.[18] (*See* doc. 31 at 49.) However, they do not argue that this section provides immunity to the City for Hutchins's actions. (*See id*. at 35-40.) Therefore, the court is not called upon to decide whether the City, as a matter of law, is entitled to immunity under § 11-47-190.[19]

---

[18]Defendants argue:

> Punitive damages are not recoverable against a municipality for federal claims. The U.S. Supreme Court has consistently held that public policy does not support punitive damages against a city for the bad-faith actions of its officials. *City of Newport News v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Hutchins is due qualified immunity. For state law claims, they are also, as a general rule, prohibited by statute. §§ 6-11-26, 6-11-29, and § 11-47-190, Ala. Code (1975). In any event, Alabama law limits the City's liability for tort claims, *including wrongful death actions* to $100,000.00 for bodily injury or death to one person. §§ 11-93-2, 11-47-190, 6-11-29. Based on the above arguments, Hutchins and the City are also due state agent immunity.

(Doc. 31 at 49.)

[19]The court notes that, pursuant to Ala. Code § 11-47-190, the City is liable for injuries caused by "the ***neglect, carelessness or unskillfulness*** of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty." The Alabama courts have held that a claim against a municipality alleging that its

## D.  PUNITIVE DAMAGES

Defendants contend the City is not liable for punitive damages under federal law, which plaintiff concedes.  Defendants also contend that the City is not liable for punitive damages under state-law.  The only state-law claim against the City is for wrongful death; section 11-93-2 of the Alabama Code limits damages to "$100,000.00 for . . . death for one person in any single occurrence."  Ala. Code § 11-93-2.  Therefore, although only punitive damages are available in a wrongful death case under Alabama law and punitive damages against a municipality are limited under Alabama law, section 11-93-2 expressly provides that the City may be liable in a wrongful death case for up to $100,000.

Defendants' Motion for Summary Judgment as to plaintiff's federal claim for punitive damages against the City is granted; the Motion is denied as to plaintiff's state law claim against the City and all claims against Officer Hutchins.

---

police officer used excessive force in effecting an arrest may be cognizable under § 11-47-190 as a "negligent assault and battery" – a claim that the amount of force used by the officer was greater than that which a skilled or proficient officer would use in similar circumstances. *See Franklin v. City of Huntsville*, 670 So. 2d 848, 852-53 (Ala. 1995); *see also City of Birmingham v. Thompson*, 404 So. 2d 589 (Ala. 1981) ("This case was submitted to the jury on the theory that an agent of the City of Birmingham had used 'excessive force' upon the plaintiff . . . .

The record in this case contains sufficient evidence to support a reasonable jury finding that Officer Hutchins's conduct was "not measured or patterned for the circumstances, or [was] an unskilled response . . .," and that his use of force under the circumstances was not the "response [that] a skilled or proficient officer would exercise in similar circumstances." *City of Birmingham v. Thompson*, 404 So. 2d 589, 592 (Ala. 1981).

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are material facts in dispute and defendants are not entitled to judgment as a matter of law as to plaintiff's excessive force claim against Officer Hutchins in his individual capacity and her wrongful death claims against the City and Officer Hutchins in his individual capacity. The court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law as to plaintiff's excessive force claim against the City, her equal protection claim against the City and Officer Hutchins in his individual capacity, and all claims against Officer Hutchins in his official capacity. An Order granting in part and denying in part defendants' Motion for Summary Judgment, (doc. 30), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 28th day of September, 2012.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE